**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-60273-PCH**

**UNITED STATES OF AMERICA**

**vs.**

**LINDSLEY CHAMBERS JR,**
**ROBERT MCKINLEY THOMAS,**
**JUSTIN ANTHONY SEIVRIGHT,**
**TACAVEON TRAVON CARSON,**
**PHILLIP MICHAEL VALCIN JR,**
**BRANDON JEROME SNIDER, and**
**PATRICK MARQUIS AYTON JR,**

**Defendants.**

_____/

**RESPONSE BY THE UNITED STATES TO**
**THE COURT'S NOTICE OF SENTENCING ISSUES (DE 227)**

On June 7, 2026, the government filed its sentencing memorandum as to all Defendants

(DE 223).   On June 9, the Court *sua sponte* entered a Notice of Sentencing Issues (DE 227) (the

"Notice"), which noted the wide range in the number of ATM withdrawals of Pandemic

Unemployment Insurance ("UI") benefits attributed to each Defendant.   The Notice directed the

parties to be prepared to discuss at the sentencing hearing: (1) whether the Court should consider

the disparity in the number of withdrawals in determining the fair and reasonable sentence for each

Defendant; and (2) whether each Defendant kept the funds he withdrew or shared them with

co-conspirators.

Although the Notice did not require a written response, the government respectfully

submits this filing to address the important issues raised by the Court.   The government is

prepared to discuss these matters and present evidence to supplement the record as needed at the

sentencing hearings.

I.      **Whether the Court should consider the disparity in the number of ATM withdrawals in determining the fair and reasonable sentence for each Defendant.**

The withdrawal of cash from ATMs using debit cards issued in the names of unknowing identity-theft victims was the primary method by which Defendants collected fraudulent UI benefits from CA-EDD.   However, the number of individual ATM withdrawals does not directly correlate with culpability for every Defendant.   For some Defendants, evidence shows an inverse relationship between the number of ATM withdrawals they made and their involvement in planning and executing the conspiracy.   As explained below, the number of withdrawals by Thomas (116) and Chambers (28) suggests greater culpability than they had, whereas the number of withdrawals by Snider (3) and Valcin (11) substantially understates their culpability.   The number of ATM withdrawals for Seivright (98), Ayton (57), and Carson (45) are consistent with their substantial culpability.   Accordingly, the Court should not treat the disparity in ATM withdrawals as a meaningful or reliable indicator of overall culpability in determining the appropriate sentences in this case.

### Thomas and Chambers

In complex schemes like this one—involving hundreds of fraudulent UI claims, stolen PII, counterfeit identification documents, and hundreds of debit cards issued to identity-theft victims— the leaders and organizers often shield their involvement by recruiting others to conduct the bulk of the ATM withdrawals.   A common practice is to find homeless or otherwise destitute individuals and offer them a small portion of the proceeds in exchange for making withdrawals. Thomas and Chambers, who were captured on ATM security cameras making 116 and 28 withdrawals, respectively, fit the pattern of such recruited underlings.

2

When law enforcement interviewed Chambers, he stated that he kept $50 to $100 for each $1,000 withdrawal he made and turned over the remaining cash to the individuals who supplied him with the cards.   Chambers was cooperative but, due to his drug use at the time, was unable to identify these individuals, describing them only as "guys on the street."   Similarly, Thomas admitted during a consensual interview that he made ATM withdrawals using debit cards supplied by others and was permitted to keep approximately $50 to $100 for each $1,000 withdrawal. Thomas also did not know the names of those who provided him the cards and who retained most of the cash, but after he was indicted, he informed the government through counsel that he recognized co-Defendant Snider as someone who had given him debit cards to withdraw funds.

Thus, while the ATM withdrawals by Thomas and Chambers were significant, integral to the scheme, and constituted serious criminal conduct warranting meaningful punishment, their relative culpability is less than their number of withdrawals might suggest.

### Snider and Valcin

On the flip side, evidence shows that co-Defendants Snider and Valcin—who were captured on ATM security cameras making 3 and 11 withdrawals, respectively—were far more involved in the scheme than their modest withdrawals alone would suggest.   By way of example, the government proffers the following:

Snider

- In his Factual Proffer, Snider admitted that he transferred fraudulent UI funds to bank accounts in his name (DE 156 at 6).   Bank records for three of his checking accounts (Truist '9971, Truist '3766, and Citibank '3065) show receipt of **$80,425.23** through 29 separate wire transfers from BOA debit-card accounts

3

containing fraudulent UI funds issued to identity-theft victims.

- The phone number associated with Snider's Citibank '3799 account was used to activate seven fraudulently obtained BOA debit cards and to verify three fraudulent UI claims with ID.me.

- Snider also admitted in his Factual Proffer that he used an identity-theft victim's debit card containing fraudulent UI funds to purchase airline tickets for himself and others. The email address "rawbeezy8510@gmail.com" appears on these flight reservations and is otherwise associated with Snider.[1] Notably, this email address exchanged messages with "gregroymuskus@gmail.com," which, as discussed further below, is an email address connected to Seivright and fraudulent UI claims for 18 identity-theft victims.

- The phone number on Snider's flight reservations is linked to Snider and was the phone number for the fraudulent BOA debit card used to purchase those tickets. Toll records show calls between this number and Valcin's phone number.

Valcin

- In his Factual Proffer, Valcin admitted that he used his phone number ending in 6465 to activate four BOA debit cards, two of which he used to withdraw fraudulent UI benefits (DE 153 at 6). Valcin further admitted that four debit cards he used to withdraw fraudulent UI funds were also used by Thomas, indicating that Valcin was responsible for distributing the debit cards to increase the number of withdrawals after he activated them (DE 153 at 6).

---

[1] For example, the recovery email address for "rawbeezy8510@gmail.com" is "bsnider85@aol.com."

- Email address attribution connects Valcin to the submission of fraudulent UI claims for 25 identity-theft victims in this case. Specifically, the email addresses used for UI claims of these 25 victims all contained the personal subdomain "@gucci794.33mail.com."[2] The forwarding email address for that subdomain is "jimmollinari11@yahoo.com," which is associated with Valcin in several ways. For instance, Valcin used "jimmollinari11@yahoo.com" to open a PayPal account in his own name and to obtain a roof repair estimate. That email address is also associated with Valcin through website cookies linking it to "phillipvalcin@yahoo.com," which is the email address on file for his J.P. Morgan bank account.

**<u>Seivright, Ayton, and Carson</u>**

With respect to Seivright, Ayton, and Carson, their number of ATM withdrawals captured on security cameras—98, 57, and 45, respectively—aligns with their considerable culpability in this case, as demonstrated by additional evidence and their criminal histories. By way of example, the government proffers the following:

<u>Seivright</u>

- In addition to withdrawing $98,000 himself in 98 separate ATM transactions between June and October 2021, Seivright is connected through email attribution with fraudulent UI claims for 18 identity-theft victims in this case. Specifically, the email addresses used for the UI claims of these 18 victims all contained the personal

---

[2] A personal subdomain allows the user to create unlimited, disposable email addresses. A user can invent aliases by adding any characters before the subdomain. Any email sent to the alias is forwarded to the user's real, hidden mailbox. In this case, 25 identity-theft victims had an email address using the subdomain "@gucci794.33mail.com."

subdomain "@gm794.33mail.com."    The forwarding email address for that subdomain is "gregorymuskus@gmail.com," which is associated with Seivright in several ways.   For instance, the recovery phone number for this email account is Seivright's cell number ending in 6678.   Additionally, this email account exchanged emails with co-defendant Snider's email account ("rawbeezy8510@gmail.com").

- In 2021, Seivright was convicted of organized fraud in a Brevard County case that involved him unlawfully obtaining and using replacement credit cards for a victim's account (PSR ¶ 81).   Seivright was arrested for that charge in May 2021 by the Margate Police Department, which executed his arrest warrant during a traffic stop. During a search incident to arrest and an inventory search of Seivright's vehicle, law enforcement found Seivright in possession of counterfeit licenses, various credit cards in other persons' names, and other evidence of UI fraud.   Specifically, officers recovered several debit cards linked to fraudulent UI claims submitted using the personal subdomain "@gm794.33mail.com" (the same subdomain used for claims of 18 identity-theft victims in the instant case) and/or Seivright's phone number ending in 6678 (the phone number of the email account "gregorymuskus@gmail.com" associated with him).   Additionally, Seivright possessed a counterfeit license bearing his photo and PII of a victim whose information was used to submit three UI claims (in Ohio, Kansas, and California).   Seivright also had instructions to activate BOA debit cards containing CA-EDD UI funds, the same type of cards used in the instant offense.

6

Ayton

- Ayton withdrew $57,000 of fraudulent UI funds in 57 separate transactions between May and July 2021. The timing of his participation in this offense aligns with his involvement in other fraud cases, indicating that Ayton's conduct here is part of a broader pattern of fraudulent behavior rather than an isolated incident. For instance, Ayton served a term of probation from approximately November 2018 through May 2020 for possession of a counterfeit driver's license (PSR ¶ 78). The counterfeit license in that case had Ayton's picture with another person's name, driver's license number, date of birth, and address. During the arrest in that case, Ayton also possessed four sets of checking account and bank routing numbers written on a piece of paper and two fraudulent checks containing another person's PII (PSR ¶ 78). Then, in 2023, Ayton was charged and later convicted of burglary of an unoccupied vehicle, grand theft, criminal use of PII, and fraudulent use of credit cards. He completed a jail sentence in that case and is presently on probation. Ayton was charged in two additional fraud cases in 2024 and was adjudicated guilty of similar conduct (PSR ¶¶ 82-83).

Carson

- In addition to withdrawing $45,000 of fraudulent UI funds himself in 45 separate transactions during the one-year period from January through December 2021, Carson activated debit cards and transferred money to co-conspirators. For instance, Carson's phone number ending in 9668, which is the phone number for his Wells Fargo bank account, was used to activate 10 debit cards and verify 9 claims with ID.me. Another

phone number associated with Carson ending in 3109, which is listed on his Zelle account linked to his Wells Fargo account, was used to activate two debit cards (and made calls to Valcin's phone).   Notably, five of the debit cards that Carson used were also used by Thomas and Chambers, indicating that Carson was a source of these cards.

- Bank records show Zelle transfers to co-Defendants Valcin and Seivright from Carson's Wells Fargo account linked to his phone number ending in 9668.

- Notably, Carson's brother, Keith Carson, received $26,552 through six wires directly from BOA debit cards containing fraudulent UI funds from CA-EDD.

*     *     *

In sum, while each Defendant's respective ATM withdrawals captured on security cameras are a factor the Court can weigh in determining the appropriate sentence, the Court should not rely on the disparity in the numbers to present the full picture of relative culpability.   The number of withdrawals by Thomas (116) and Chambers (28) overstates their overall culpability based on the underlying circumstances, whereas the number of withdrawals by Snider (3) and Valcin (11) substantially understates their culpability.   The number of ATM withdrawals for Seivright (98), Ayton (57), and Carson (45) are consistent with their considerable culpability.

Additionally, it is worth noting that not all the ATM withdrawals in this case were captured on ATM security cameras and/or preserved by the bank.   Approximately $1.6 million of fraudulent UI funds were withdrawn during this conspiracy, and the maximum allowable amount per transaction was $1,000—meaning well over 1,000 withdrawals occurred.   Defendants were positively identified by surveillance images making a total of 358 ATM withdrawals.   As such, additional withdrawals of fraudulent UI funds in this case remain unattributed.

8

**II.      Whether each Defendant kept the funds he withdrew or shared them with co-conspirators.**

As explained above, Thomas and Chambers stated during interviews with law enforcement that, for each $1,000 withdrawal they made, they kept about $50 to $100 and gave the remainder of the cash to the co-conspirator who provided them with the debit card.   Law enforcement found their statements to be credible and consistent with similar UI fraud cases in which leaders and organizers shield their involvement by recruiting homeless or otherwise destitute individuals to make ATM withdrawals in exchange for a small portion of the proceeds.

Additionally, as explained above, there is evidence of transfers of funds among Defendants and co-conspirators, as well as the sharing of debit cards with one another.   There is also evidence from social media, phone and email records, and criminal histories that Defendants are well acquainted with each other.   This evidence further suggests that Defendants shared in the proceeds of the fraud.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:   */s/ David A. Snider*
David A. Snider
Assistant United States Attorney
Court ID No. A5502260
99 N.E. 4th Street
Miami, FL 33132
Tel: (305) 961-9446
Email: david.snider@usdoj.gov